# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Michael J. Liberati    :
     Plaintiff,  :  Civil Action No.: 2:05-cv-1661
  v.      :
        :
BRT, INC.     :
and       :
Harold Mast, President  :
BRT, INC.     :
    Defendants. :

## PLAINTIFF'S OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT & INCORPORATED MEMORANDUM OF LAW

Michael J. Liberati has initiated this lawsuit in order to be compensated for the discriminatory conduct of his former employer, BRT, Inc. and the President of BRT, Inc., Harold Mast.  Mr. Liberati deserves to be compensated by a jury for the illegal conduct engaged in by the defendants which is in violation of Title I and Title V of the Americans with Disabilities Act of 1990 (ADA), as codified, 42 U.S.C. § 12101 et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981 et seq., 42 U.S.C. § 1981a et seq. and 42 U.S.C. § 1988 et seq., which incorporates by reference Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq.; the Pennsylvania Human Relations Act, as amended, Section 5, 43 P.S. § 951 et seq. (PHRA) and state/federal law governing intentional/negligent infliction of emotional distress.

## I.  SUMMARY JUDGMENT STANDARD.

Summary Judgment is disfavored in employment cases, *Jalil v. Avdel Corp.,* 873 F.2d 701, 707 (3rd Cir. 1989).  A plaintiff must be allowed to establish illegal discrimination in an employment case and special caution should be exercised in deciding whether to grant summary judgment to an employer when its intent is at issue, *Goosby v. Johnson & Johnson Medical, Inc.,*

228 F.3d 313, 321(3rd Cir. 2000).  The existence of genuine issues of material facts requires that summary judgment be denied, *Medical Protective Co. v. Watkins*, 198 F.3d 100, 103 (3rd  Cir. 1999); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 106 S.Ct. 1348 (1986).

The plaintiff concedes to the dismissal of Count II of his complaint:  harassment/ hostile work environment.  For the reasons as set forth in this opposition, the plaintiff respectfully requests that this court deny the defendants' motion for summary judgment with regard to Count I – Discrimination and Failure to Provide Reasonable Accommodation; Count III – Retaliation; Count IV – PHRA; and Count V – Intentional/Negligent Infliction of Emotional Distress.

## II.  STATEMENT OF FACTS.

The plaintiff, Michael J. Liberati, is a former employee of BRT, Inc.  Defendant, BRT, Inc., is a business/corporation, qualified to transact business in the Commonwealth of Pennsylvania.   Defendant, Harold Mast, President of BRT, Inc., is being sued individually and/or in his official capacity as provided by the aiding and abetting provisions of the PHRA, see *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 553 (3rd Cir. 1996).

The plaintiff was/is at all relevant times a qualified individual with a disability as provided by the ADA and the PHRA.  The plaintiff was diagnosed with depression and Attention Deficit Hyperactivity Disorder (ADD and ADHA) in 2000, *Ex. A, Dr. Block's Expert Report*. ADD/ADHA is a lifelong disability that is a genetically based neurodevelopment disorder with chronic neuropsychiatric sequellae and comorbidity with anxiety disorders, depression and substance use/abuse.  The plaintiff's disabilities substantially limit his ability to perform several major life activities including concentrating and thinking normally, i.e. cognitive functioning, *Id.*

The plaintiff was employed by the defendant, BRT, INC., as a router/dispatcher from July, 23, 2001 until December 16, 2002.  The plaintiff was originally hired for the position of

dispatcher, then shortly prior to his request for reasonable accommodation and his subsequent discharge, his duties where expanded to include routing tasks, *Ex. B, ¶ dep. at 90-91*.[1]   Routing tasks require a high level of concentration and Mr. Liberati found the additional tasks to be absolutely overwhelming, *Ex. B, ¶ dep. at 94; Ex. C*.   By letter dated November 12, 2002 to Harold Mast, the plaintiff informed his employer that he suffered from ADD and requested reasonable accommodation after his duties were expanded so that he could have a quieter place to work and concentrate, *Ex. C, November 12, 2002*.   [2]

In the November 12, 2002 letter, the plaintiff requested that he be permitted to perform his job duties in an area of the defendants' offices where any distractions could be minimized, *Ex. C*.   The plaintiff also stated that he was open to any alternative accommodations that the defendants could suggest in order to reasonably accommodate his disabilities, *Id*.   The defendants did not provide any reasonable accommodation to the plaintiff at any time after the plaintiff made the formal request for reasonable accommodation, *Ex. B, ¶ dep. at 13; Ex. D, Thies dep. at 19-20*.   The defendants did not suggest or provide any alternative reasonable accommodation to the plaintiff at any time after the plaintiff made the formal request for reasonable accommodation, *Id*.   The defendants never even spoke to the plaintiff about his request for reasonable accommodation and they never requested any documentation from the plaintiff or his physicians evidencing his disabilities, *Id*.   The plaintiff's reasonable

---

[1] The Plaintiff testified that his routing duties were expanded shortly before he requested reasonable accommodation on November 12, 2002, *Ex. B, ¶ dep. at 90-91*. The defendants, however, intimate that the plaintiff's duties were expanded to include routing much earlier than the plaintiff asserts, *Defs. Mot. for SJ at 2*. This fact is in dispute.

[2] On November 6, 2002, the plaintiff was cited for not notifying Dan Robbins, his direct supervisor, that he would be late since he had stayed late the night before, the plaintiff forgot to do so. Dan Robbins permitted the plaintiff to come in late the next day if he had to stay late to finish his work if he notified him (Robbins) that he (plaintiff) would be late. During a meeting with management concerning his tardiness on November 6, 2002, the plaintiff told his supervisors that he was experiencing trouble finishing his work on time. *Ex. B, ¶ dep. at 80, 90-92*. Moreover, on November 7, 2002, the plaintiff was cited for an incident that occurred with Vince Sciotti. There was a falling out between the plaintiff and Mr. Sciotti because the plaintiff was told just to do the routing not the dispatching. Mr. Sciotti felt that the plaintiff was not being a team player because Mr. Sciotti needed the plaintiff's assistance with answering the phones. During that meeting with management over the Sciotti incident, the plaintiff asked if he could perform his duties in a different, quieter location, *Ex. B, ¶ dep. at 93-95*.

accommodation request was not an undue hardship because the defendants had/have numbers of areas where the plaintiff could perform his duties with limited distractions, *Id.; Ex. D, Thies dep. at 24*. At all times, the defendants failed to participate in the interactive process to determine a reasonable accommodation for the plaintiff's disabilities.

Sometime after the plaintiff submitted his request for reasonable accommodation via the November 12, 2002 letter, Jan Thies[3], Human Resource Manager at the time of plaintiff's employment, wrote a response to the letter which response was circulated among BRT, Inc. management, *Ex. G, Thies Memo*; *Ex. D, Thies dep. at 21*.[4] Jan Thies testified that Harold Mast gave him the plaintiff's letter a few days after he (Harold Mast) received the letter, *Ex. D, Thies dep. at 15-16*. Jan Thies testified that Harold Mast said that he (Mast) contacted an attorney about the plaintiff's November 12, 2002 letter, *Id*. Jan Thies stated in the Memo and reiterated at his deposition that he did not believe that the plaintiff could perform the functions required of routing without some type of special arrangements, *Ex. G; Ex. D, Thies dep. at 61*.

Subsequent to his engaging in protected activity by requesting reasonable accommodation, the plaintiff was issued an unwarranted reprimand dated December 10, 2002 which instructed the plaintiff not to use the applications he appended to the company's BRAVO computer operating system, *Ex. E*. The plaintiff testified that he started using his computer applications without any dissent from management since approximately one-two months after his employment began, *Ex. B, ¶ dep. at 106-108*. And, the plaintiff testified that other employees at BRT, Inc. were using the plaintiff's computer applications during his employment with the company, *Id*. The December 10, 2002 reprimand letter states that some of the plaintiff's computer applications were actually incorporated into the BRAVO operating system even

---

[3] Jan Thies has since been promoted to the position of General Manager at BRT, Inc., *Ex. D, Thies dep. at 7*.

[4] This Memo was never given to or viewed by the plaintiff until after the case was under investigation.

though the letter instructs the plaintiff to cease using the applications. No one ever had a problem with the plaintiff's applications until after he asked for reasonable accommodation.  The first time the plaintiff was told not to utilize the applications was via the letter dated December 10, 2002*, Ex. B, ¶ dep. at 107-108*.

John Vanande is a general employee at BRT, Inc., *Ex. H, Vanande dep. at 6*.  Mr. Vanande testified that received a call from the plaintiff prior to the plaintiff's discharge from BRT, Inc., *Ex. H, Vanande dep. at 10-11*.  Mr. Vanande testified that the plaintiff told him that he (plaintiff) had ADD, *Ex. H, Vanande dep. at 12*.  Mr. Vanande further testified that the plaintiff was under the impression that Mr. Vanande also suffered from the same disability, *Id*.  Mr. Vanande testified that the plaintiff called him because if Mr. Vanande suffered from the same disability maybe they could bond together and not be subject to discrimination and discharge, *Ex. H, Vanande dep. at 12, 15*.  Mr. Vanande testified that he has never been on any medication for ADD and that he has not been diagnosed with ADD, *Ex. H, Vanande dep. at 14-15*.  Mr. Vanande did, however, testify that he was subjected to ridicule at BRT, Inc., *Id*.  He testified that he is unbalanced and that there is a rumor going around at BRT, Inc. that if John (Vanande) is in a good mood then he is taking his medication and if John was in a bad mood, he didn't take his medication, *Ex. H, Vanande dep. at 14*.  Mr. Vanande testified that he told Harold Mast directly, the very next day, about the phone call involving the plaintiff and he testified that the plaintiff was discharged a few days after he (Vanande) spoke with Harold Mast, *Ex. H, Vanande dep. at 17-18*.

Jan Thies testified that he was told that there was an employee who disclosed to Harold Mast that the plaintiff was accessing other employees' e-mails, *Ex. D, Thies dep. at 18-19*.  Jan Thies testified that he was instructed to look into the plaintiff's e-mails based on that employee's

communications with Harold Mast, *Id*.  The employee is now known to be John Vanande, *Id*.  However, Mr. Vanande testified that he did not discuss with Harold Mast anything about the plaintiff and computers because he (Vanande) didn't know that much about computers, *Id.; Ex. H, Vanande dep. at 17-18*.  This false information that Mr. Vanande tipped Harold Mast about the plaintiff accessing others' e-mails was communicated to Judge Strawbridge during the mediation conference in this case, *Ex. D, Thies dep. at 19*.

On December 16, 2002, the plaintiff was informed that he was discharged from his employment at BRT, Inc. by Wayne Lapp[5], Terminal Manager; Dan Mast, Vice President; Jan Thies, Human Resource Manager; and defendant, Harold Mast, President.[6]  The plaintiff was given a written discharge letter at time of his discharge, see *Ex. F*.  The plaintiff's discharge occurred approximately one month after the plaintiff formally requested reasonable accommodation and just a few days after he spoke with Mr. Vanande.  The sole and/or motivating reason for the plaintiff's discharge is disability discrimination and retaliation.

## III. LEGAL ARGUMENT.

All of the issues raised by the defendants relate to the plaintiff's ability to establish a prima facie case of disability discrimination and disability retaliation with the exception of their alleged defense of legitimate business reason for the adverse employment action of discharge.  The burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to ADA claims.  See *Shaner v. Synthes*, 204 F.3d 494, 500 (3rd Cir. 2000). [7]

---

[5] Mr. Lapp is no longer employed by BRT, Inc.
[6] Jan Thies testified that Harold Mast normally plays a role in the decisions to discharge people and that in November, 2002, Mr. Mast played a big role in personnel decisions at BRT, Inc., *Ex. D, Thies dep. at 50-51*.
[7] The plaintiff must establish a prima facie case of discrimination and/or retaliation, then the burden shifts to the defendant to articulate a non-discriminatory legitimate reason for the adverse employment action, then the burden shifts back to the plaintiff to show by a preponderance of the evidence that the reason is pretextual.  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093, 67 Led.2d 207 (1981).

## A.  DISABILITY DISCRIMINATION. [8]

To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) that he is disabled within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; (3) he has suffered an adverse employment action as a result of the discrimination.  An adverse employment action includes failure to provide reasonable accommodation and termination.  See *Williams v. Philadelphia Housing Authority Police Department*, 380 F.3d 751 (3rd Cir. 2004); *Taylor v. Phoenixville School District*, 184 F.3d 296, 306 (3rd Cir. 1999).  A failure to make a reasonable accommodation for a disabled and qualified employee constitutes disability discrimination under the ADA, *Id.*

### 1.  The Plaintiff Is A Qualified Individual With A Disability And His Disabilities Substantially Affect His Cognitive Functioning.[9]

A qualified individual with a disability is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  A disability is defined by the ADA as (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such impairment; or (C) being regarded as having such an impairment.  42 U.S.C. § 12102(2)(A).

Several factors are to be considered in evaluating whether an individual is substantially limited in a major life activity:  (i) the nature and severity of the impairment; (ii) the duration or

---

[8] "An analysis of an ADA claim applies equally to a PHRA claim."  *Taylor v. Phoenixville School District*, 184 F.3d 296, 306 (3rd Cir. 1999), citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3rd Cir. 1996).  So, for purposes of this brief, the plaintiff will argue pursuant to the federal statutes.  If the plaintiff's claims are sustained under the ADA, then they must likewise be sustained pursuant to the PHRA.

[9] The defendants have conceded that thinking and concentrating are major life activities, *Defs. Mot. for SJ at 18*, citing *Cambria*, 2005 U.S. Dist. Lexis 13101 (E.D.Pa. 6/30/05).  Moreover, the defendants admitted that the plaintiff is qualified to perform the essential functions of the position for which he was hired at BRT, Inc.  The defendants asserted in their motion for summary judgment that Liberati did an excellent job as a router/dispatcher, *Defs. Mot. for SJ at 4, 25; Ex. I, Dan Mast dep. at 17*.  So, these issues are not in dispute.

expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2). The question of whether an individual is substantially limited in a major life activity is a question of fact. See *Gagliardo v. Connaught Lab., Inc.*, 311 F.3d 565, 569 (3rd Cir. 2002).

The United States Supreme Court has held in *Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999), that when making a determination regarding whether a person is disabled within the meaning of the ADA a court must look to whether the person's disability is correctable through medication or other measures. "If a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures – both positive and negative – must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus disabled under the Act." *Sutton*, 119 S.Ct. at 2146. In *Sutton*, the court found that the plaintiffs were not disabled because their vision was correctable to 20/20. "The central question, in light of Sutton . . . is whether [plaintiff's] continuing impairment remained a 'disability' under the ADA by imposing substantial limitations even while treated." *Taylor,* 184 F.3d 296, 308 (3rd Cir. 1999). In *Taylor* the court denied defendants' motion for summary judgment and found issues of fact relating to whether plaintiff continued to be substantially limited even while taking lithium to control bipolar disorder.

ADHD, ADD and depression are disabilities within the meaning of the statutes. ADHD, ADD and depression are classified psychiatric mental disorders and substantially limit an individual's ability to concentrate, think, and focus etc. like a member of the general public. The United States Supreme Court has held that "Whether a person has a disability under the ADA is an individualized inquiry." *Sutton*, 527 U.S. 471, 483 (1999). An ADA plaintiff "needs to demonstrate that the impairment limits a major life activity." *Toyota Motor Manufacturing,*

8

*Kentucky, Inc. v. Williams*, 534 U.S. 184, 195 (2002).  So, it follows that one cannot be precluded per se from demonstrating that any type of impairment limits a major life activity.

The Third Circuit noted in *Fredrick L. v. Thomas,* 557 F.2d 373, 375 (3rd Cir. 1977) that learning disabilities are profound and are "disorders in basic psychological processes."  More recently, the Third Circuit has recognized attention deficit disorder as a disability in deciding a case concerning what constitutes a protected individual within the meaning of the ADA.  The court held that "Appellant [person with ADD] has, in addition, alleged that the discrimination occurred on the basis of a disability as understood under the Act.  Also, the parties do not dispute on appeal that appellant is "disabled" as that term is defined in the ADA."  *Menkowitz v. Pottstown Memorial Medical Center*, 154 F.3d 113(3rd 1999).  In *Gagliardo*, 311 F.3d 565 (3rd Cir. 2002), the plaintiff was permitted to show that the MS she suffered from caused her to be substantially limited in the major life activities of concentrating and remembering.  And, in *Taylor*, 184 F.3d 296, 307 (3rd Cir. 1999), the Court accepted that "thinking is a major life activity." See also, *Cambria v. Association of Flight Attendants*, 2005 U.S. Dist. Lexis 13101 (E.D.Pa. 6/30/05) (same).[10]

Overall, the evidence in this case overwhelming leads to the conclusion that the plaintiff is a qualified individual with a disability which disability substantially affects his ability to perform the major life functions of thinking and/or concentrating.  First, Harold Mast was directly informed by the plaintiff in the November 12, 2002 letter that the plaintiff suffered from the disability of ADD.  The plaintiff explained in the letter that ADD is a disability and that "this

---

[10] In the present case, the plaintiff asserts that he is a qualified individual with disabilities that limit him in the major life activities of thinking, concentrating, i.e. cognitive functioning, not working.  The standards are different with regard to what major life activity is at issue.  The defendants have appeared to have blurred the law with regard to the standards affecting the differences between the major life activities of thinking/concentrating and working, *Defs. Mot. for SJ at 29*.  To be substantially limited in the major life activity of **working**, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice.  *Sutton*, 527 U.S. 471 (1999).  There is no requirement that the plaintiff establish that he is precluded from performing a broad base of jobs when the contention is that he is limited in the major life activity of thinking, concentrating.

is something that I have lived with for my whole life." *Ex. C*.  The plaintiff stated in the letter

that "to perform tasks that require high levels of detail a person with ADD needs to minimize the

environmental distractions." *Id*.  Then, the plaintiff requested that he be permitted to perform his

duties in an area where distractions could be minimized.  The plaintiff said he was open to

alternate accommodations.  *Id*.

Next, the plaintiff's expert witness and treating physician, Dr. Daniel Block,

affirmatively stated in his expert report that the plaintiff suffers from the permanent disabilities

of "major depressive episode, recurrent, moderate severity; adult ADHD and episodic alcohol

abuse." *Ex. A*.  Dr. Block stated that these disabilities affect the plaintiff's ability to concentrate,

think in an organized manner, pay attention and sleep.  Dr. Block stated that the plaintiff was

treated with various medications over the years but that medication adjustments were needed

because "certain medications may not be working as well anymore because of tolerance or loss

of efficacy." *Ex. A*.

The defendants have admitted in their summary judgment motion that the plaintiff is

depressed and that depression is a mental impairment, *Defs. Mot. SJ at 17-18*.  However,

unrelated to the issue of ADD/ADHD, the defendants contend that the plaintiff did not establish

that he was depressed at the time of his discharge, *Id*.  However, Dr. Block's expert report

unequivocally indicates that the plaintiff was depressed in November, 2002 and December, 2002,

*Ex. A*.  So, the argument that the plaintiff has not produced any medical evidence to substantiate

his claim that he suffered from depression in November, 2002 and December, 2002 is

unfounded.  The plaintiff was diagnosed with depression in June, 2000.  The defendants could

have obtained all of the plaintiff's medical records when they were notified of the plaintiff's

ADD disability.  The defendants could have spoke to the plaintiff about his disabilities and then

they would have been apprised of the plaintiff's disabilities in their totality.   But instead, according to the plaintiff, the defendants "blew me off, stonewalled me.  Nobody talked to me.  I was shunned and fired," just a few days before Christmas.  *Ex. B, ¶ dep. at 136-137*.   The egregious discharge of the plaintiff at Christmas because he suffered from mental disabilities caused him severe emotional distress and significantly worsened his depressive mental state.

Dr. Block's report clearly indicates that the medication taken by the plaintiff for his disability never completely corrected his disability.   To the contrary, even while on the medications of Wellbutin and Adderall, the plaintiff continued to experience lack of sleep, anxiety, stress and periods during the day of lack of concentration, *Ex. A*.  The medications taken by the plaintiff helped his disability over the years but the medications in no way corrected his disability, *Ex. B, ¶ dep. at 62*.  The United States Supreme Court held in *Sutton*, 527 U.S. at 482 (1999), that to sustain a claim that the disability does **not** substantially limit a major life activity, the medication must affirmatively ***correct*** the claimant's condition.

Furthermore, the fact that BRT, Inc. was informed by its own Human Resource Manager, Jan Thies, that the plaintiff could not perform the additional duties of routing/dispatching without some sort or special arrangements is critically important.  Jan Thies stated in a Memo written in response to the plaintiff's November 12, 2002 request for reasonable accommodation that "It does appear that Mike cannot perform the functions required of a routing dispatcher without some type of special arrangements." *Ex. G*.  Mr. Thies reaffirmed this conclusive statement at his deposition, *Ex. D, Thies dep. at 6*.  Therefore, the defendants knew that the plaintiff's disabilities affected his ability to perform his duties without reasonable accommodation.

Thus, clearly, the plaintiff's own testimony, the plaintiff's medical evidence and the admissions on behalf of the defendants, indisputably sustain the plaintiff's assertion that he is a

qualified individual with a disability which disability substantially affects his ability to perform the major life activities of thinking and concentrating, i.e. cognitive functioning.  At the very least, the defendants' motion for summary judgment should be denied with regard to plaintiff's disability discrimination claim because genuine issues of material facts exist that pertain to whether the plaintiff's disabilities substantially limit him in the major life activities of thinking and concentrating i.e. cognitive functioning.  The Third Circuit has held that it is a question of fact whether an individual is substantially limited in a major life activity, and it is commonly accepted that fact questions should be left to the determination of the jury, *Gagliardo*, 311 F.3d 565, 569 (3rd Cir. 2002).  In *Gagliardo* the court found that a jury could reasonably conclude that the plaintiff was substantially limited in her ability to concentrate and remember based on the testimony of her treating physician, her employers' recognition that she had concentration and memory problems, and the testimony of other witnesses that the plaintiff experienced fatigue and muscle spasms.   Thus, the Third Circuit refused to overturn a jury verdict in favor of the plaintiff for $2.5 million, *Id*.

### 2.   The Defendants Reliance On The Leona Collins Case Is Misplaced.

The defendants' reliance on the case, *Collins v. Prudential Investment and Retirement Services, 2005 U.S. App. Lexis 148 (3rd Cir. 2005)*, is misplaced because the case is not precedential and the case is distinguishable from the facts of the instant case. In *Collins*, the plaintiff was not denied a jury trial at the summary judgment stage; the case was heard before a jury and a directed verdict was granted to the defendants.[11]  On Appeal, the Third Circuit, stating that it was writing only for the parties involved, affirmed the lower court's findings pursuant to *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 150 (2002).  The lower court's

---

[11] The defendants erroneously assert that the *Collins* case involved the plaintiff's appeal of a summary judgment grant to the defendants, *Defs. Mot. for SJ at 21*.   This is wrong, the case involved a jury trial and a directed verdict.

opinion was left undisturbed because the Third Circuit did not find that the district judge abused his discretion when he weighed the evidence and made credibility determinations. Ms. Collins didn't even know she had ADD until after she suffered an adverse employment action.

The defendants have argued in this case that because Ms. Collins was successful in life despite her ADD and because the plaintiff was arguably successful in certain aspects of his life despite his disabilities, his claim cannot be sustained as per the *Collins* case. However, contrary to what the defendants have argued, the Third Circuit has never ruled that the accomplishments of a disabled person constitute a defense to a disability case. And, it would be imprudent for this court to make factual judgments concerning the plaintiff's so-called successes because these are fact questions that should be left to the jury.

In *Emory v. Astrazeneca Pharmaceuticals LP*, 401 F.3d 174 (3rd Cir. 2005), a precedential case which was decided a few months after *Collins*, the Third Circuit held that "The key question is not whether a handicapped person accomplishes [his goals], but whether [he] encounters significant handicap-related obstacles in doing so." The *Emory* case involved a cerebral palsy individual who suffered from physical disabilities and mental disabilities. The district court made the *Collins* argument and said that since Emory had fulfilled accomplishments and goals, he wasn't disabled within the meaning of the ADA, so the district court granted summary judgment to the defendants. The Third Circuit looked at the difficulties Emory faced in accomplishing his goals and reversed the grant of summary judgment.

In the present case while it is true that the plaintiff has graduated from college and has had many jobs over the years there is no indication in the record that the plaintiff's disabilities did not create significant obstacles for him. The record unequivocally demonstrates that the plaintiff struggled to graduate from college. His college transcripts show that he received 6 Ds

and 17 Cs while he was in attendance at Delaware Community College and Shippensburg University.  Moreover, the transcripts indicate that his GPA sank after he transferred to a 4 year University Program, *Ex. J*.  Dr. Block stated in his report that the plaintiff's B/C average in college was, in the plaintiff's opinion, "below what he felt he could and should have been able to achieve." *Ex. A*.  The plaintiff was plagued with difficulties throughout college, "where he finished with a C average." *Id*.  A jury could reasonably conclude that the fact that a plaintiff has had numerous jobs during his life establishes that he suffered many obstacles/struggles relating to his disabilities because he could not achieve job security.  The defendants' motion should be denied because there are genuine issues of material fact that relate to whether the plaintiff encountered disability related obstacles in accomplishing some goals, *Id*.

### 3.   The Defendants Regarded The Plaintiff As Disabled.

In the alternative, the plaintiff maintains that the defendants committed illegal discrimination and/or retaliation by failing to afford him with reasonable accommodation and by discharging and retaliating against him because he was regarded as disabled as per the definition provided at 42 U.S.C. § 12102(2) and any other correlating federal and/or state law.  The plaintiff maintains that he was regarded as disabled by the defendants because he (1) has a physical or mental impairment that does not substantially limit a major life activity but was treated by the defendants as constituting such limitation; (2) has a physical or mental impairment that substantially limits a major life activity as a result of the attitudes of defendants and/or employees within the defendant company toward such impairment; or (3) has no such impairment but was treated by the defendants as having a substantially limiting impairment.  The illegal discrimination/retaliation in the present case is based upon the plaintiff's disabilities as perceived by the defendants. *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 188 (3rd Cir. 1999).

The Third Circuit has held in a precedential opinion that a 'regarded as' employee is entitled to reasonable accommodation in the same manner as those who are actually disabled. *Williams*, 380 F.3d 751 (3rd Cir. 2004).  The law in the Third Circuit is that a 'regarded as' employee can make out a prima facie case of disability discrimination even if there is an innocent mistake on behalf of the employer concerning the complainant's disability or extent of his disability.  Therefore, there is no good faith defense in a 'regarded as' case under the ADA and the PHRA.  The employer's state of mind, however, remains relevant to the appropriate remedies.  *Williams*, 380 F.3d 751 at n. 14 (3rd Cir. 2004).  The prima facie standards for a 'regarded as' employee are the same for a disabled employee.  And, "even where an employer mistakenly regards an employee as so disabled that the employee cannot work at all, the employer still must accommodate a 'regarded as' employee by seeking to determine, in good faith, the extent of the employee's actual limitations."  *Williams*, 380 F.3d 751 at n. 19.

In *Taylor*, 177 F.3d 180, 189 (3rd Cir. 1999), the Court held that it is not intrinsically contradictory to argue that the plaintiff is actually disabled and 'regarded as' disabled, "as he could have an impairment (whether or not it rose to the level of a disability) that could actually be accommodated, despite [his employer's] perception that his disability was too severe to accommodate."  See *Williams*, 380 F.3d 751 at n. 10 (3rd Cir. 2004).  Also, a party is free to plead in the alternative, Federal Rule of Civil Procedure Rule 8(e)(2).

There is no question that the plaintiff was regarded as disabled by the defendants.  Harold Mast was informed by the plaintiff in the plaintiff's request for reasonable accommodation that the he (plaintiff) suffered from the permanent, life-long disability of ADD.  The plaintiff clearly told Harold Mast that he needed reasonable accommodation in order to minimize distractions since his duties had been expanded to include routing, *Ex. C*.

In addition, sometime after the plaintiff submitted his requested for reasonable accommodations via the November 12, 2002 letter, Jan Thies, Human Resource Manager at the time of plaintiff's employment, wrote a Memo in response to the plaintiff's November 12, 2002 letter, *Ex. G, Thies Memo*; *Ex. D, Thies dep. at 21*.  Jan Thies stated in the Memo and reiterated at his deposition that he did not believe that the plaintiff could perform the functions required of routing/dispatching without some type of special arrangements, *Ex. G; Ex. D, Thies dep. at 61*. The Thies Memo was circulated to all of the management team, including defendant, Harold Mast, and it was arguably written at the request of Harold Mast and/or other members of BRT, Inc. management, *Id*.

Therefore, not only were the defendants aware of the plaintiff's disability at the time of discharge, but they regarded him as disabled because they were told by the plaintiff and a member of the management team that the plaintiff needed accommodation for his disability. [12] The plaintiff's claim that the defendants regarded him as disabled in violation of the ADA should not be dismissed because a jury could reasonably find that the facts of this case show that the defendants regarded the plaintiff as disabled.

### 4.   The Plaintiff Was Entitled To Reasonable Accommodation.

Reasonable accommodation "includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith," See *Mengine v. Runyon*, 114 F.3d 415, 416 (3rd Cir. 1997).  It is a fact question whether a proposed accommodation is reasonable, *Buskirk v. Appollo Metals*, 307 F.3d 160, 170 (3rd Cir. 2002).  An employee can show that an employer breached the duty to act in good faith in the interactive process to assist in

---

[12] The defendants possessed more than a mere awareness that that the plaintiff was impaired.   So, the *Kelly v. Drexel University, 94 F.3d 102 (3rd Cir. 1996)* statement that "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that the perception caused the adverse employment action," is inapplicable to the facts of the present case.

reasonably accommodating the employee by showing that: (1) the employer knew of the employee's disability; (2) the employee requested accommodations or assistance for his disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. *Taylor*, 184 F.3d 319-320.

In addition, "employers can show their good faith in a number of ways, such as taking steps like the following:  meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome." *Williams*, 380 F.3d 751 at n. 16 (3rd Cir. 2004).  However, where an employer fails to engage in the interactive process he runs the risk of overlooking an opportunity to accommodate a statutorily disabled employee thereby violating the ADA, *Williams, 380 F.3d 751 at n. 16,* citing *Taylor, 184 F.3d at 317.*

Requesting a reasonable accommodation standing alone is a protected activity under the ADA, therefore there is no need for a complainant to file a formal charge regarding the failure to accommodate.  See *Shellenberger v. Summit Bancorp, Inc.*, 318, F.3d 183, 191 (3rd Cir. 2003).

The defendants erroneously argue that the plaintiff was/is not entitled to a reasonable accommodation because they unknowingly gave him accommodations prior to his formal request dated November 12, 2002 i.e. they implemented the plaintiff's computer applications to the BRAVO system and they let him come in late when he had to work overtime the previous night. This novel argument put forth by the defendants lacks support under any case law and this is clear because the defendants have not cited any applicable statutory law or case precedent.  So, at

the summary judgment stage, this argument should not be counted in determining whether the plaintiff was entitled to reasonable accommodation.

In addition, citing *Bennett v. Unisys Corp.*, 2000 U.S. Dist. Lexis 18143, *27 (E.D. Pa. 12/11/00), the defendants argue that if the plaintiff was capable of performing his duties without being moved to a quieter location, then the plaintiff was not entitled to the accommodation of a quieter location, *Defs. Mot. for SJ at 31*.  The citation to the *Bennett* is confusing because *Bennett* does not support the defendants' position.   In *Bennett*, Judge Van Antwerpen denied the defendant's motion for summary judgment concluding that depression is a disability that affected the plaintiff's ability to think, concentrate and interact with others.  Moreover, the court found that there is a low barrier that would trigger an employer's obligation to engage in the interactive process relating to a reasonable accommodation even when a formal request for reasonable accommodation has not been made.    Therefore, the *Bennett* case makes it clear that whether or not the plaintiff was capable of performing the essential functions of the job without accommodation is a disputed fact question that should be decided by the jury.

Jan Thies told the defendants that the plaintiff needed accommodation, *Ex. G; Thies dep. at 61*.  The plaintiff told the defendants in the November 12, 2002 letter that he needed the accommodation, *Ex. C*.  The plaintiff informed the defendants that he was disabled, *Id*.  The plaintiff could have been easily accommodated.  The plaintiff's reasonable accommodation request was not an undue hardship because the defendants had/have numbers of areas where the plaintiff could perform his duties with limited distractions, *Id.; Ex. D, Thies dep. at 24*.  The plaintiff stated at his deposition "They know what I had. I asked for an accommodation.  I made it clear to them.  They had the same accommodation I was after."  *Ex. B, ¶ dep. at 137*.  The

defendants never engaged in the interactive process at all, so the defendants intentionally violated the ADA.[13]

Furthermore, Dr. Block stated that it was his professional opinion that "had ADA guidelines been followed and had BRT been more willing to work with Mr. Liberati, whatever problems arose in his performance could have been adequately addressed and handled and he could have remained there as a productive employee." *Ex. A.*

The plaintiff respectfully requests that his claims for disability discrimination not be dismissed at the summary judgment stage.  All that the plaintiff needs to show in order to establish a prima facie case of disability discrimination is: (1) that he is disabled within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; (3) he has suffered an adverse employment action as a result of the discrimination.  The plaintiff has established that he is disabled or that he was regarded as disabled by his employers.  The defendants have admitted that the plaintiff could perform the essential functions of his job with or without reasonable accommodation.  And, the plaintiff was unlawfully discharged.  Moreover, the defendants failed to engage in the interactive process and to provide the plaintiff with available reasonable accommodations based on disability discrimination.  All of the evidence supports the plaintiff's disability discrimination claims and at the very least the evidence of the plaintiff's testimony, the testimony of the plaintiff's expert treating physician and the testimony of other BRT, Inc. employees creates genuine issues of material facts.

---

[13] See *Deane v. Pocono Medical Center*, 142 F.3d 138, 149 (3rd Cir. 1998) (en banc), where the court held that one phone call between an employer and an employee regarding the requested reasonable accommodation "hardly satisfies our standard that the employer make reasonable efforts to assist the employee, to communicate with him in good faith[.]"

**B.  DISABILITY RETALIATION.**

In order to establish a prima facie case of illegal retaliation under the anti-disability discrimination statutes, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3rd Cir. 2002) (quoting *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 500 (3rd Cir. 1997).   As was stated earlier, requesting a reasonable accommodation standing alone is a protected activity under the ADA, *Shellenberger*, 318, F.3d 183, 191 (3rd Cir. 2003).

A disability retaliation claimant does not have to establish that he is actually disabled in order to prevail.   "The right to request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC, and we have already explained that the ADA protects one who engages in the latter activity without regard to whether the complainant is 'disabled.'" *Shellenberger*, 318 F.3d 183, 188 (3rd Cir. 2003).   The Third Circuit has held that a plaintiff only needs to show "that she had a reasonable, good faith belief that she was entitled to request the reasonable accommodation," *Williams*, 380 F.3d 751 (3rd Cir. 2004).

The temporal proximity of time between the protected activity and the termination can be itself sufficient to establish the causal link, *Shellenberger*, 318 F.3d at 183 (quoting *Woodson v. Scott Paper Co*., 109 F.3d 913, 920 (3rd Cir. 1997).   However, the timing must be "usually suggestive of retaliatory motive before a causal link will be inferred." *Shellenberger*, 318 at F.3d at 189 n.9 (quoting *Krouse*, 126 F.3d at 503).   10 days in *Shellenberger* was sufficient to establish a prima facie showing of causation.   However, where the temporal proximity of time is not so close to be unduly suggestive (2 months in the *Williams* case), the Third Circuit has

recognized that "timing plus other evidence may be an appropriate test . . ." *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3rd Cir. 2003).

The defendants in the present case have argued that the plaintiff's retaliation claim should be dismissed because the plaintiff did not make a good faith request for reasonable accommodation and because the time between the request for accommodation and the resultant discharge indicates a lack of causation. The plaintiff clearly made his request for reasonable accommodation in good faith. He was diagnosed with ADD/ADHD and depression in the year 2000, *Ex. A*. He had been on various medications due to the disabilities, *Id*. He needed reasonable accommodation after his duties were expanded to include routing, *Ex. C*. The accommodations that the plaintiff requested were very limited and available at the BRT, Inc. offices in which he worked, *Ex. D, Thies dep. at 24*. The plaintiff even told Harold Mast in the November 12, 2002 letter that he was open to any other type of accommodation that was available, *Ex. C*. The only bad faith that exists in this case with regard to the request for reasonable accommodation is the defendants' complete refusal to engage in the interactive process with the plaintiff, *Ex. B., ¶ dep. at 13; Ex. D, Thies dep. at 19-20*.

The defendants discharged the plaintiff 34 days after he requested reasonable accommodation.[14] In addition, the defendants discharged the plaintiff only a few days after John Vanande spoke with Harold Mast. John Vanande told Harold Mast that the plaintiff had called him (Vanande) to discuss ADD. The plaintiff thought Mr. Vanande also suffered from ADD and the plaintiff thought that maybe they could bond together in an effort to prevent discrimination and discharge, *Ex. H, Vanande dep. at 10-15*. Therefore, the temporal proximity of time between the plaintiff's discharge and Mr. Vanande informing Harold Mast about the

---

[14] It is likely that this period is even shorter because the plaintiff mailed the November 12, 2002 letter to Harold Mast.

phone-call Vanande received from the plaintiff is unduly suggestive of retaliation.   Moreover, the fact that the defendants never engaged in the interactive process with the plaintiff clearly supports a conclusion that the defendants violated the ADA when they retaliated against the plaintiff by discharging him after he asked for reasonable accommodation.   Thus, since the plaintiff has established all of the elements of a prima facie case and since he has raised material issues of fact that can surely support a jury verdict of illegal retaliation, the plaintiff's claim for retaliation should not be dismissed.

### C.  THE DEFENDANTS' CLAIM THAT THE PLAINTIFF WAS DISCHARGED BASED ON A LEGITIMATE BUSINESS REASONS IS PRETEXTUAL.

The defendants' alleged business reasons for the discharge of the plaintiff are pretextual. The defendants claim that the plaintiff was discharged because he appended custom applications to the BRAVO system when he was "repeatedly" asked not to do so and because he intercepted management employees' e-mails.

First, the plaintiff testified that he started using his custom computer applications appended to the BRAVO system without any dissent from management since approximately one-two months after his employment began, *Ex. B, ¶ dep. at 107-108.*   And, the plaintiff testified that other employees at BRT, Inc. were using the plaintiff's computer applications during his employment with the company, *Id.*   The plaintiff testified that the first time he was told not to use his applications was by letter dated December 10, 2002, after he requested reasonable accommodation, *Ex. B, ¶ dep. at 107-108.*   The December 10, 2002 reprimand letter states that some of the plaintiff's computer applications were actually incorporated into the BRAVO system, so it is hardly believable that the stated reason for the discharge, appending applications to the BRAVO system, was legitimate.   No one ever had a problem with the plaintiff's applications until after he asked for reasonable accommodation.   In addition, the

defendants argue at page 34 in their motion that Jan Thies discovered that the plaintiff used his self-designed program on December 11th and 12th, 2002 after the plaintiff was told not to do so. The plaintiff stated that he did not use the applications again after being told not to do so by letter dated December 10, 2002, *Ex. B, ¶ dep. at 113*.

The argument that the appended applications were causing the BRAVO system to corrupt is pretextual.   Jason Waters, the IT contractor for BRT, Inc., testified that the BRAVO system was a nightmare and it regularly corrupted, *Ex. K, Waters dep. at 20*.  Mr. Waters testified that BRT, Inc. stopped using the BRAVO system on November 15, 2005 because the system was more maintenance that what was wanted, *Ex. K, Waters dep. at 20-21*.  Mr. Waters testified that it was mere speculation, "a gut feeling," that the system was corrupting more often when the plaintiff was working and he testified that Mike (the plaintiff) "wouldn't have had to have been there for it to corrupt either," *Ex. K, Waters dep. at 34*.

Next, the plaintiff affirmatively denies that he ever intercepted other employees' e-mails while he was employed at BRT, Inc., *Ex. B, ¶ dep. at 114*.   The defendants have appended to their motion numbers of images of computer screens that they claim indicate that the plaintiff intercepted e-mails.  Looking at the images, there is no way to confirm that they came from the computer that was utilized by the plaintiff during his employment.  Jason Waters stated at his deposition that BRT, Inc. utilized an unsecured system where Outlook stored all the employee e-mail files, *Ex. K, Waters dep. at 26-27*.  He further stated that anyone could look into all of the Outlook e-mail files because the files were unsecured, *Id*.  And, he stated that is was relatively simple to access other people's e-mails, *Id*.  All of the employees at BRT, Inc. had passwords to access their e-mails.   BRT, Inc., through management, had access to all of the employee passwords.  In the BRT, Inc. Information Systems Policy, dated March 5, 2002, attached hereto

as *Ex. L*, the policy clearly states that "**all [e-mail] passwords are know to the BRT, Inc., as the system may need to be accessed by BRT, Inc. in the absence of an employee**."

It is the position of the plaintiff that after he asked for reasonable accommodation, Harold Mast contacted an attorney and he (Mast) was arguably told about the law regarding the defense of a legitimate business reason, *Ex. D, Thies dep. at 15-16*.[15]  So, in an effort to fabricate a defense to the plaintiff's claims, Harold Mast, along with other members of management, issued the plaintiff the December 10, 2002 unwarranted reprimand stating that he should stop using his BRAVO applications.  Then, with the help of Jason Waters and Jan Thies, BRT, Inc. accessed the plaintiff's files and tried to create evidence that would indicate that the plaintiff was still using his applications and/or that he was intercepting e-mails.  It is clear that BRT, Inc. management had the ability and motive to append false information to the plaintiff's computer which could create a reason for the unlawful discharge.  In light of the defendants' egregious acts of discrimination and retaliation, it is pretextual that the business reason for the plaintiff's discharge was using custom computer applications and intercepting e-mails.

### D.  NEGLIGENT/INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

In order for a plaintiff to establish a state law claim for negligent infliction of emotional distress in Pennsylvania a plaintiff must have suffered from some sort of bodily injury, *Simmons v. Pacor, Inc.*, 674 A.2d 232, 238 (Pa. 1996).  In the instant case, the plaintiff suffered from bodily manifestations of the negligent infliction of emotional distress so this claim should not be dismissed.   Dr. Block stated that the intentional, unlawful discharge of the plaintiff caused severe anxiety.  Dr. Block stated "Anxiety about the situation with and termination from BRT, Inc., was prominent to the point it was interfering with his functioning and he had begun using

---

[15] Jan Thies testified that Harold Mast said that he (Mast) contacted an attorney about the plaintiff's November 12, 2002 letter, *Ex. D, Thies dep. at 15-16*.

his wife's Ativan.  Whenever he would see a truck from BRT his anxiety level would acutely increase.  He was awakening with anxiety about it and felt unable to let go of what happened, especially the accusation of theft [of computer files].  He had been so upset about this that he had requested for that session to be longer and was seen for a full session as opposed to the usual medication visits.  Buspar was prescribed @ 15 mg BID for his anxiety."

In order for a plaintiff to sustain a state law claim for intentional infliction of emotional distress in Pennsylvania a plaintiff must show that the defendants' conduct was extreme and outrageous, *Cox v. Keystone Carbon Co.*, 861 F.2d 390 (3rd Cir. 1988).  In this case the actions of the defendants were extreme and outrageous so this claim should not be dismissed.  The defendants discharged the plaintiff a few days before Christmas and the defendants deceitfully concocted an illegitimate defense by secretly appending false information to the plaintiff's computer.  The defendants falsely accused the plaintiff of using applications that he was asked not to and the defendants falsely accused the plaintiff of intercepting other employees' e-mails after he requested reasonable accommodation.  The defendants refused to engage in the interactive process relating to requests for reasonable accommodations.  And, the defendants did all this, when they knew that the plaintiff suffered from mental disabilities.   The extent of the outrageousness of the defendants conduct should be questions left to the jury.

**IV.  CONCLUSION**.

For all of the foregoing reasons, the plaintiff respectfully requests that this court deny the defendants' motion for summary judgment with regard to Count I – Discrimination and Failure to Provide Reasonable Accommodation; Count III – Retaliation; Count IV – PHRA; and Count V – Intentional/Negligent Infliction of Emotional Distress of his complaint.  The plaintiff concedes to the dismissal of Count II of his complaint.

Plaintiff's Opposition to Defendants'
Motion for Summary Judgment
& Incorporated Memorandum of Law

Respectfully Submitted by:


SIGNATURE CODE:  SAZ4759
s/Sharon Ann Ziegler, Esq.
(PA Attorney I.D. No. 64027)
5118 Foxfire Trail
Kingsport, TN  37664
(423) 288-9623

John Neumann Hickey, Esq.
(PA Attorney I.D. No. 61896)
20 West Front Street
Media, PA  19063
(610) 891-8883

Attorneys for Plaintiff
Michael J. Liberati


DATE:  February 15, 2006

# CERTIFICATE OF SERVICE

I, Sharon Ann Ziegler, Esq., the undersigned and attorney of record for the plaintiff in the case *Liberati v. BRT, Inc. et al., Civil Action File No.: 2:05-cv-1661* hereby certifies that a true and correct copy of *Plaintiff's Opposition to Defendants' Motion for Summary Judgment and Incorporated Memorandum of Law*, was served on February 15, 2006 via e-mail transmission and regular U.S. mail, to the following counsel of record:

Michael J. Crocenzi, Esq.
Goldberg Katzman
320 Market Street
Strawberry Square
P.O. Box 1268
Harrisburg, PA  17108-1268

Attorney for Defendants

SIGNATURE CODE:  SAZ4759
s/Sharon Ann Ziegler, Esq.